UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 15-2990-CMM

IN RE: CRIMINAL COMPLAINT

_____/

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: *[signature]*
ANTHONY W. LACOSTA
ASSISTANT UNITED STATES ATTORNEY
Court No. A5500698
99 N. E. 4th Street
Miami, Florida 33132
TEL (305) 961-9280
FAX (305) 536-4676
anthony.lacosta@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>**MATTHEW VALDES PEREZ**<br>and<br>**LAZARO GARCIA**<br>*Defendant(s)* | Case No. 15-2990-CMM |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____see below_____ in the county of _____Miami Dade_____ in the _____Southern_____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666(a)(1)(B); | See ATTACHMENT A |
| 18 U.S.C. § 666(a)(2); and | |
| 18 U.S.C. § 1951(a). | |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT OF FBI SPECIAL AGENT DONALD MORIN II

☒ Continued on the attached sheet.

*SA Donald P. Morin, II*
Complainant's signature

FBI Special Agent Donald Morin, II
Printed name and title

Sworn to before me and signed in my presence.

Date: 07/24/2015

*Judge's signature*

City and state: Miami, Florida

Chris M. McAliley, U.S. Magistrate Judge
Printed name and title

ATTACHMENT A
(Description of Offense(s))

Between January 15, 2014, and January 15, 2015, the defendant, **Matthew Valdes Perez**, in Miami Dade County, in the Southern District of Florida, did corruptly solicit and demand for the benefit of any person, accept and agree to accept anything of value from any person, intending to influenced and rewarded, as an agent of a State and local organization, government, and any agency thereof, in connection with any business, transaction, and series of transactions involving anything of value of $5,000 or more, within a one year period that said organization, government, and agency has received more than $10,000 under a Federal program, involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(1)(B);

Between January 15, 2014, and January 15, 2015, the defendant, **Lazaro Garcia**, in Miami Dade County, in the Southern District of Florida, did corruptly give, offer, or agree to give anything of value to any person, with intent to influence and reward an agent of an organization, State government, and local government, and any agency thereof, in connection with any business, transaction, and series of transactions of such or organization, government, and agency involving any of value of $5,000 or more, within a one year period that said organization, government, and agency has received more than $10,000 under a Federal program, involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(2) and

From in or around September 2014, and continuing through in or around October 2014, the exact dates being unknown, the defendants, **Matthew Valdes Perez** and **Lazaro Garcia,** did knowingly and willfully combine, conspire, confederate, and agree with each other to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by means of extortion, as the terms "commerce" and "extortion" are defined in Title 18, United States Code, Sections 1951(b)(2) and (b)(3), by obtaining property from another, with his consent, under the color of official right, in violation of 18 U.S.C. §1951(a).

# AFFIDAVIT

I, Donald P. Morin, II being duly sworn, depose, and state as follows:

**Introduction.**

1.  I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since 1999. I am currently assigned to the Miami Division of the FBI where my investigative responsibilities include public corruption and civil rights matters. In my work with the FBI, I have conducted numerous investigations concerning violations of federal laws by public officials.

2.  This affidavit is provided for the limited purpose of establishing probable cause for the arrest of **Matthew Valdes Perez ("Valdes")** and **Lazaro Garcia**. The facts in this affidavit are intended to establish probable cause to believe that Valdes and Garcia have committed the following crimes.

    a.  18 U.S.C. § 666(a)(1)(B);
    b.  18 U.S.C. § 666(a)(2); and
    c.  Conspiracy to violate 18 U.S.C. § 1951(a).

3.  The facts described in the affidavit are known personally to me, or have been provided to me by other law enforcement personnel. Because the facts are intended for the limited purpose of establishing probable cause, they do not describe every fact known to me regarding this investigation.

**General Allegations**

4.  During all times relevant to the facts alleged in this affidavit, Defendant **Matthew Valdes Perez ("Valdes")** was employed as a Miami-Dade Police Department (MDPD) Public Service Aide (PSA) and was assigned to uniform duties in the Kendall District as a PSA for Miami-Dade County. A PSA is a uniformed MDPD employee whose work involves nearly all duties as performed by police officers. The chief difference between a PSA and an officer is enforcement powers, that is, a PSA cannot make an arrest. A PSA does have access to law enforcement databases and is used for a variety of non-hazardous law enforcement functions. For example, MDPD PSAs will respond to and process motor vehicle accidents, write accident reports, issue accident summons, and perform other duties as required.

5.  During all times relevant to the facts alleged in this affidavit, Defendant **Lazaro Garcia** was the president of a wrecker service company located in Miami Dade County. From surveillance and recordings by a confidential source (CHS), as described below, your affiant also knows that Garcia regularly operates one of the wreckers (tow trucks) for the company.

6.  The Confidential Human Source (CHS) utilized in this investigation was the owner and manager of an auto collision repair center in Miami-Dade County. The CHS's auto-collision company routinely obtained and used auto parts manufactured outside the state of

Florida and also routinely billed insurance companies for the cost of customer repairs. Accordingly, the CHS's auto collision company was operating in and affected interstate and foreign commerce.

7. Miami-Dade County has a rotational wrecker system. A rotational wrecker system is a process where certain tow companies contract with the County to be placed on a rotational wrecker list for various geographic areas within MDPD jurisdiction. When there is a traffic accident, police regulations require the officer to contact dispatch if the stranded motorist requests a tow and then dispatch will contact the designated towing company for that geographic area. Because the county has a rotational wrecker system, it is against Florida state law for tow trucks to approach stranded drivers and solicit business directly. Within the towing industry, tow truck operators that attempt to circumvent the rotational wrecker system and illegally solicit business from stranded motorists are known as "pirates."

8. Miami Dade County Police Department is a local government agency that has received in excess of $10,000 federal funding through grants between January 15, 2014, and January 15, 2015.

9. Neither Lazaro Garcia nor his towing company is on MDPD rotational tow list.

**The Tow Away Scheme.**

10. In August 2014, the investigating agents approached the aforementioned CHS. CHS admitted his involvement in a number of criminal offenses, one of which included the CHS's participation in a corruption scheme involving CHS's auto collision repair center. In regard to that offense, CHS admitted that CHS would receive damaged and disabled vehicles from tow truck drivers and pay the tow truck drivers a cash kickback based upon the value of the anticipated repairs. CHS admitted that CHS knew that some of the tow truck drivers delivering vehicles to CHS's collision repair center were, in turn, paying police officers and/or public service aides for access to, or information regarding, accident scenes.

11. CHS identified Lazaro Garcia, the owner and manager of a towing company, as one of the persons that had a corrupt relationship with a public official. CHS knew of this relationship because Garcia would often deliver vehicles to the CHS's business. According to the CHS, a Miami-Dade Police Department (MDPD) Public Service Aide named "Matt," who CHS believed worked in the Kendell District, DPM worked with Garcia. According to CHS, Garcia would pay "Matt" for accident location information so that Garcia could beat competitors to the location and illegally solicit business directly from stranded accident victims. CHS reported that Matt would provide Garcia information from his MDPD issued computer, and that Matt had also provided Garcia with a police radio so that Garcia could listen to police transmissions and identify accident locations.

12. To corroborate CHS's bribery allegations, the FBI provided CHS with a recording device. On August 26, 2014, CHS met with Garcia. During that recorded conversation, Garcia discussed towing cars and that Valdes ("Matt") had been sending him "holdings."[1] Garcia described Valdes's work schedule. Garcia emphasized that ". . . he's helping us out." When CHS suggested Garcia shouldn't "short" Valdes, Garcia admitted paying Valdes for the assistance ("Ask him how we pay that nigga. Fast!"). Garcia also described the location he was paying Valdes near "Sunset and 97th."

13. Later that same day, under FBI direction, CHS called Garcia to suggest that they should give Valdes a Labor Day present. Garcia thought it would be appreciated, but indicated that the present should be money ("he's got kids, money is more important than anything else." Garcia indicated that, "I just need him [Valdes] to give me the calls." Garcia indicated that Valdes didn't need to be working to give him accident information.[2] Garcia also referenced Valdes fixing a ticket, and that Garcia had instructed the affected party to pay Valdes $200 for that service.

14. Between August 26th and August 29th, CHS recorded Garcia making further admissions regarding bribes paid to Valdes. For example, during a recorded meeting on August 29, 2014, Garcia told CHS that Valdes had already made $1,000 that week from Garcia. During that same meeting, Garcia accepted a call from Valdes in the presence of CHS, and the recording device picked up Garcia's side of the conversation where Garcia asked Valdes if his MDPD computer ("CAD") was working, asked about an accident in Miami, and discussed meeting up with Valdes to take care of him.

15. During this same time period, under FBI direction, CHS had suggested to Garcia that they pay Valdes a bonus for Labor Day. Garcia agreed that this was a good idea, suggested cash, and they ultimately decided to pay a $400 bonus to Valdes together.

---

[1] "Holding" is a term used by police (and pirate tow truck drivers) to describe accidents that have been reported to police dispatch (911) but that have not yet been assigned a responding officer or PSA. The location of these reported accidents will be listed on the police department computer system (CAD) as "holding." Because the accidents have not yet been assigned over police radio frequencies, information regarding these holding calls is especially valuable to pirate tow truck drivers. With this information, a pirate tow truck operator can beat other competitors to the accident scene, even those with their own police scanners. Also, because the call is not yet assigned, a pirate with this information also has a better chance of beating responding police units to the accident scene, allowing the pirate to illegally solicit the stranded driver without interference.

[2] Your affiant knows through experience working investigations on similar schemes that PSA and officers can access police databases even while off duty by logging onto their government issued laptop computers.

16. On September 2, 2014, CHS met with Garcia, who in turn introduced CHS to Valdes. On the way to the meeting, Garcia instructed CHS to place the $400 cash in an envelope. When Garcia and CHS met Valdes in a parking lot, Valdes accepted the $400 cash. Garcia and Valdes spoke briefly about Valdes forwarding Garcia information about crashed cars that were "holding." Valdes also reminded Garcia and CHS that if they needed any help with traffic tickets, they should give him a call. After getting back into their car and leaving the scene, the CHS told Garcia that they should check with Valdes and see if he would provide them with accident reports. Garcia agreed. This meeting was recorded.

17. On September 5, 2014, Garcia told CHS that they owed Valdes $900 for four vehicles that Garcia's company had towed to CHS's shop. The towed vehicles were an Acura, a Mercedes, a black Toyota Corolla, and a Silver Toyota Corolla. CHS met with Garcia and Valdes in Southwest Miami Dade County and paid Valdez $900 cash.

18. During this September 5th meeting, CHS reported that Valdez discussed having previously provided a digital, encrypted MDPD radio to Garcia. Valdes told CHS that he believed CHS had been good to him because of the money CHS paid Valdes. In exchange for CHS's fair treatment of Valdes, Valdes offered to charge a discounted rate of only $2,000 for Garcia and CHS's use of the police radio. Valdes said he normally have charged $3,000 for use of the radio. Garcia had been storing the radio in a closet waiting for the county's radio system to return to the digital encryption system, as opposed to the more easily monitored analog system.[3]

19. This September 5th meeting was photographed by FBI surveillance units, but the CHS's recording device malfunctioned, and no sound was recorded. The CHS's description of what occurred during the meeting was subsequently corroborated by other successfully recorded conversations.

20. For example, on September 9, 2015, CHS and Garcia met. During that recorded meeting, Garcia was recorded stating that Valdes ("Matt") was happy and Garcia referenced the previous $900 payment. During this call, when the CHS asked Garcia if Valdes had agreed to

---

[3] In early 2014, MDPD began a transition from analog radio signals to digital radio signals. New radios were issued to MDPD personnel to facilitate this transition. Under the analog system, anyone with a police scanner could monitor the MDPD frequencies. A switch to a digital, encrypted system would present several barriers to public monitoring, including the high cost of digital monitoring devices. Without the properly programmed equipment, these new frequencies could not be monitored by MDPD outsiders. Being able to gain access to the new digital frequencies would therefore be valuable to a tow truck driver because they could monitor the system for accidents and beat their competitors to the accident scene for the purpose of illegally soliciting business.

provide police report information for a solicitation scheme, Garcia called Valdes and placed him on speaker phone. During that phone call, which was recorded, Garcia asked Valdes if he could gather the report information regarding accidents. Valdes agreed. Garcia promised Valdes that he would be taken care of. They agreed to meet later in the week, after Valdes had time to collect and write down various accident victims' contact information in a notebook.[4]

**The Doctor Scheme.**

21. To document the illicit relationship between Garcia and Valdes, CHS was instructed by the FBI to request copies of MDPD accident reports. From experience gained during this and related investigations, your affiant knows that a common and lucrative illegal scheme is for tow truck drivers to provide accident information to corrupt doctors and lawyers, who in turn use that information to illegally solicit accident victims for business. Accordingly, the FBI instructed CHS to inform Garcia that CHS had met a Russian chiropractor that was willing to pay for confidential information that identified recent accident victims.[5]

22. When CHS asked Garcia if he had any law enforcement connections who could provide accident reports, Garcia suggested Valdes. During a series of recorded conversations, CHS explained to both Garcia and Valdes that the police report information would be provided to a Russian doctor, who had people that would solicit accident victims directly after receiving the information in the police reports. In regard to compensation, CHS explained that Valdes could expect to receive approximately $1000 a week for 50 or more names. In regard to Garcia, Garcia was told that he (Garcia) and the CHS could expect to be paid $2500 at the end of the month - approximately $1250 each. Both Garcia and Valdes agreed to participate in the plan during a series of recorded conversations.

23. On September 16, 2015, for example, Garcia provided CHS a handwritten list detailing the names, contact information, and other information regarding 58 accident victims. Garcia told CHS that the list had been compiled by Valdes. The leads on the list were for accidents less than a month old.

24. Later that same day, Garcia and CHS met with Valdes to review the list inside a parked truck. During the recorded meeting, Valdes indicated that future lists would include the

---

[4] For example, recorded quotes from this conference call are Valdes-Perez asked, "Tell me what you want." Garcia asked, "How many (crash reports) can you get in a week." Valdes stated, "A whole bunch. It's just that I don't know if they are good or bad." Garcia asked, "You are writing them down, right?" Valdes stated, "Yep." Garcia asked, "How many contacts by Friday?" Valdes stated, "Between 75 and 100." Garcia responded, "I want to make sure you are taken care of."

[5] Florida state law prohibits the release of crash reports to unauthorized third parties before a 60-day period. Any access to a crash report within 60 days after the date the report is filed cannot be used for any commercial solicitation of accident victims or knowingly disclosed to any third party for the purpose of solicitation during the period of time that the information is to remain confidential. Any employee of a state or local agency in possession of information made confidential who knowingly discloses such confidential information to a person not entitled to access such information commits a felony of the third degree.

case number. Valdes also promised to provide fresher reports on a weekly basis. After the meeting, Garcia complained that the doctor wasn't paying the CHS and Garcia enough for the leads. Garcia and the CHS discussed the freshness of the confidential information. In Garcia's words, "It's like have the best, the better quality of cocaine . . . We have the better supply . . . because it's fresh, people can't grab it like we're grabbing it right now. . . It's still steaming baby."

25. The list has been retained by the FBI as evidence. Investigators have verified that the 58 names, addresses and phone numbers pertain to the accident victims whose accidents were less than 60 days old and therefore still protected by Florida statute.

26. On September 22, 2014, Valdes met with Garcia. Case numbers were also included. During the recorded meeting, Garcia provided more recent accident victims, addresses, and contact information. Garcia indicated that the information came from Valdes. During the meeting, Garcia called Valdes and they discussed the information on the list over the telephone. Garcia scheduled a meeting with Valdes later that day to arrange Valdes's first payment.

27. Later that afternoon, the CHS and Garcia drove toward 97th and Sunset to meet Valdes and pay him. The FBI had previously provided CHS with $1,000 of FBI funds to pay Valdes. On the way, Garcia counted the list of names and estimated there was information for between 95 and 105 people. When they met Valdes in a parking lot, the CHS provided Valdes $1,000 cash. Valdes discussed the list and efforts he was making to be able to obtain and print more information by reviewing accident reports on the MDPD computer system.

28. Valdes and Garcia met in a parking lot. During the recorded meeting, Valdes promised to provide more information and indicated he was attempting to link his laptop to his home computer so that he could print the information directly at his house. As CHS provided Valdes $1,000 cash in exchange for the information already provided, Valdes noted, "Always a pleasure gentleman." Garcia and Valdes then briefly discussed efforts to receive accident information in regard to the ongoing tow scheme. After Valdes left the vehicle, Garcia told CHS that the CHS had made his day. Garcia also asked about the progress the Russian ("Ruso") was making going through the list. Garcia emphasized keeping Valdes happy was a priority: "I cannot close the doors with that guy. . . that man right there is my future long term business partner."[6]

29. On September 26, 2014, Garcia and CHS met. During the recorded conversation, Garcia told CHS that Valdes had more names, and that Valdes wanted to get paid. Garcia then called Valdes on speaker phone. Garcia suggested that Valdes and Garcia get special phones to speak to each other. Valdes told Garcia and CHS that he had information about approximately 50 more accident victims. Valdes said he looked through them to make certain that the

---

[6] Earlier in the meeting, while Valdes was in the car, Garcia told CHS that he (CHS) owed Valdes $400 for the continuing tow scheme. After Valdes left the vehicle, Garcia told CHS that he had paid between $700 and $900 to Valdes the previous week for tows that were attributed to Valdes's assistance.

information was really good. Garcia emphasized that he wanted to make certain that Valdes didn't get low on money, and that he was comfortable.

30. On October 2, 2014, during a recorded meeting, Garcia met CHS and emphasized that they needed to pay Valdes to keep him happy. The CHS said he was waiting for the Russian to pay him. The CHS said they could pay this week, but that they would have to just tell Valdes that they would pay him double next time because this had been a bad week. Garcia emphasized that he wanted to meet the Russian guy so he could make certain he understood that the relationship with Valdes was important.

31. Garcia and Valdes then spoke on the phone and scheduled a meeting to take place at the same spot as before (near 97th and Sunset). When Valdes arrived in his marked vehicle, Valdes was wearing his MDPD uniform. Valdes provided Garcia and CHS with a list containing the contact information of more than 60 accident victims. Garcia apologized that they did not have money and explained they were waiting for the Russian to provide more information. Garcia and explained Valdes would receive $2,000 at next meeting. Valdes explained it was only a hardship because he was expecting the money. Valdes promised he would have more information in the near future.[7]

32. On October 8, 2014, the CHS was provided with $3,200 of FBI funds to pay Garcia and Valdes money owed for the accident victim contact information. When Garcia met CHS first, Garcia told CHS that Valdes would have another list coming the following day. Garcia called Valdes on speaker phone, and they arranged to meet. Before meeting Valdes, CHS counted out the $1,200 owed Garcia and the $2,000 owed Valdes. Garcia accepted his payment. After CHS and Garcia drove to meet Valdes, Garcia and the CHS provided Valdes the $2,000 cash. Valdes promised to get more information and indicated that "I've given everything so that you guys can get a hold of people. I'm assuming because that's the whole things is, the doctor's trying to get insurance . . . from the people." Garcia explained that "Yeah, they said they have their people they send out and they, they . . ." Valdes explained he understood "... there's so much shit you can do with that insurance money. . ." and they could make "serious cash." Valdes promised to pull and deliver accident information from all the districts before he left on vacation. This meeting was recorded. During a recorded conversation with Garcia on the same day, CHS asked if Valdes was happy with the $2,000. Garcia explained that right after the meeting he and Valdes had a text message exchange that indicated Valdes was happy: "He's feeling like, like a million dollars right now son. I gave him two hundred yesterday in the car plus two stacks, that's twenty two hundred. He's happy "G". Don't worry about Matty, Matty is happy."

33. On October 9, 2014, CHS met with Garcia and the two spoke with Valdes via telephone. Valdes told CHS to bring a USB (Universal Serial Bus) flash drive so Valdes could download the police reports from his MDPD laptop.[8] Valdes told Garcia and the CHS he found

---

[7] Garcia and Valdes also continued to talk about their efforts on the tow away scheme and how business had been slow.

[8] A USB flash drive is a data storage device that includes flash memory with an integrated USB interface. USB flash drives are typically removable and rewritable.

a way to access the reports using the MDPD computer system, and he could give them 50 reports today." This meeting was recorded.

34. Before meeting Valdes in southwest Miami-Dade County, Garcia and CHS purchased a USB drive. CHS and Garcia then met Valdes who was in his MDPD uniform and was driving a marked MDPD PSA vehicle. During the meeting, the CHS provided the USB drive to Valdes. Valdes-Perez then inserted the USB drive into his MDPD issued laptop and downloaded multiple MDPD traffic crash reports to the drive and provided the steps to access the file: "Click on U.S.B. Click on Doctor Crash. Click on doctors. Click on any report... case number, name, person that wrote the report." Valdes-Perez advised that at the next meeting he would provide CHS with 150 more traffic crash reports. This USB drive was provided to the FBI and maintained as evidence.[9] The meeting was recorded.

35. On October 16, 2014, CHS met with Garcia. Garcia had previously spoken with Valdes via telephone regarding 200 more accident reports Valdes had been waiting to be downloaded for CHS. Garcia told CHS that Valdes had approximately 160-200 more crash related documents for CHS to turn over to the chiropractor. Garcia called Valdes regarding the next batch of accident reports. During the call, Garcia asked, "Do you have bread (money) to go on this vacation? The doctor said he will be ready for Tuesday." Garcia stated, "The 2.0 ($200), I will see you today." Garcia stated, "I'm going to give you another chip, okay, another USB. You have 112 (names)? Maybe from today you can rack up for Tuesday." Garcia stated, "200 (names)? That would be awesome." Garcia stated, "I'll see you today for 2.0" in reference to Valdes's payment for providing him with a crashed vehicle, a Camaro. The meeting with Garcia was recorded.

36. Florida law prohibits the disclosure of confidential information from accident reports for a period of sixty days from the date of the accident. Your affiant has verified that the accident report information provided by Valdes, as described above, was within this sixty day period. Your affiant has also verified that a significant number of the insurance companies that would have been affected had the scheme been successful, are headquartered outside the State of Florida and/or do business in multiple states (e.g. – Geico, All State, Progressive . . . ). Accordingly, had these insurance companies been billed for personal injury claims, interstate commerce would have been affected by the defendants' scheme.

**Matthew Valdes's Statement**

37. On January 7, 2015, Matthew Valdes was interviewed by the FBI. Valdes's statement included the following:

---

[9] Analysis of the USB drive used by Valdes-Perez revealed that the drive contained 49 individual .pdf files. These files contained official State of Florida Traffic Crash reports for crashes that occurred in Miami-Dade County. These reports also contained the contact information for the accident victims.

    a. Valdes admitted receiving bribes from Lazaro Garcia over a one year period. Valdes admitted receiving the money in exchange for helping Garcia tow vehicles. Valdes admitted helping Garcia by using his MDPD computer to locate accidents and then providing that information to Garcia. Valdes also admitted providing Valdes a police radio in exchange for money. Valdes stated that he would receive $200 for a total loss and $400 for a vehicle that could be repaired. Garcia estimated he had received approximately $12,000 in bribes from Garcia during this period of time.

    b. Valdes admitted meeting CHS through Valdes in fall of 2014 and participating in a new scheme. Valdes admitted collecting accident information and downloading accident reports in exchange for receiving bribes from CHS and Garcia. Valdes estimated he had received approximately $2000 for his participation in that scheme.

**Conclusion**.

38. The meetings described above all physically occurred within the Southern District of Florida.

39. Based upon the facts submitted above, your affiant respectfully submits that there is probable cause to believe that defendants **Matthew Valdes Perez** and **Lazaro Garcia** have committed the following criminal offenses:

(a) Between January 15, 2014, and January 15, 2015, the defendant, **Matthew Valdes Perez**, in Miami Dade County, in the Southern District of Florida, did corruptly solicit and demand for the benefit of any person, accept and agree to accept anything of value from any person, intending to influenced and rewarded, as an agent of a State and local organization, government, and any agency thereof, in connection with any business, transaction, and series of transactions involving anything of value of $5,000 or more, within a one year period that said organization, government, and agency has received more than $10,000 under a Federal program, involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(1)(B);

(b) Between January 15, 2014, and January 15, 2015, the defendant, **Lazaro Garcia**, in Miami Dade County, in the Southern District of Florida, did corruptly give, offer, or agree to give anything of value to any person, with intent to influence and reward an agent of an organization, State government, and local government, and any agency thereof, in connection with any business, transaction, and series of transactions of such or organization, government, and agency involving any of value of $5,000 or more, within a one year period that said organization, government, and agency has received more than $10,000 under a Federal program, involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(2) and

(c) From in or around September 2014, and continuing through in or around October 2014, the exact dates being unknown, the defendants, **Matthew Valdes Perez** and **Lazaro Garcia,** did knowingly and willfully combine, conspire, confederate, and agree with each other to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by means of extortion, as the terms "commerce" and "extortion" are defined in Title 18, United States Code, Sections 1951(b)(2) and (b)(3), by obtaining property from another, with his consent, under the color of official right, in violation of 18 U.S.C. §1951(a).

**FURTHER YOUR AFFIANT SAYETH NOT,**

Donald P. Morin, II
Special Agent, FBI

Subscribed to and sworn before me on this 24th day of July, 2015, in Miami, Florida.

CHRIS M. McALILEY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA